25CA1598 Peo in Interest of LTM 04-23-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1598
El Paso County District Court No. 23JV106
Honorable Diana May, Judge

The People of the State of Colorado,

Appellee,

In the Interest of L.T.M., a Child,

and Concerning L.Y.,

Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE YUN
Grove and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 23, 2026

Kenneth R. Hodges, County Attorney, Shannon Boydstun, Assistant County Attorney, Colorado Springs, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     In this dependency and neglect proceeding, L.Y. (father) appeals the juvenile court's judgment allocating parental responsibilities for L.T.M. (the child) to the child's maternal grandmother. We affirm.

## I.     Background

¶ 2     In December 2023, the El Paso County Department of Human Services filed a petition in dependency and neglect concerning the child, who was then four years old. The Department alleged concerns about mother's substance use and unstable housing. It also alleged that mother and her boyfriend had engaged in sexual activity in front of the child. It further alleged concerns about both parents' prior involvement in the criminal justice system and a prior dependency and neglect case.

¶ 3     Initially, the juvenile court granted temporary custody of the child to father under the Department's supervision. Less than two months later, the caseworker visited the child and noticed bruises. Father denied causing the bruises but admitted to spanking the child with a sandal and "popping" him in the mouth. Consequently, the Department obtained a verbal removal order and placed the

child with maternal grandmother. The court then transferred temporary custody of the child to the Department.

¶ 4 Shortly thereafter, the juvenile court adjudicated the child dependent or neglected. About two weeks later, father informed the court that he would not participate in the case or attend supervised family time with the child. Nonetheless, the court adopted treatment plans for both parents.

¶ 5 For the next four months, mother engaged in treatment and demonstrated sobriety through regular drug testing. During that time, father did not engage with the Department or attend family time, and he refused to provide the Department with his address.

¶ 6 In September 2024, mother relapsed and tested positive for substances. In response, grandmother promptly notified the caseworker and required mother to leave their home to protect the child's safety and wellbeing. Mother then re-engaged in treatment, agreed to a safety plan, and moved back in with grandmother and the child.

¶ 7 Around that time, the Department reported that father had re-engaged in the case. After six months of no contact with the child, father attended a supervised family time session. He also

completed a global assessment and an online parenting class. In the following months, however, the Department reported that father's contact with the child was inconsistent because father was not living in Colorado.

¶ 8 Father then moved for an allocation of parental responsibilities (APR) for the child. Specifically, father proposed that the court order the child to live out-of-state with him during the school year and with mother in Colorado during the summer. Thereafter, both mother and the guardian ad litem moved for an APR to grandmother. Their proposed parenting plans differed slightly, but both included unsupervised parenting time for father.

¶ 9 In June 2025, the juvenile court held a contested APR hearing. After considering the evidence, the court granted custody of the child to grandmother and unrestricted parenting time to mother. The court "reluctantly" granted father out-of-state parenting time during the summer as well as visits in Colorado during the school year. It further ordered regular phone or video contact between the child and father during periods when the child is not with him. Finally, the court granted sole decision-making authority to

3

grandmother but required her to consult with both parents before making major decisions concerning the child.

## II. Discussion

¶ 10 Father contends that the juvenile court abused its discretion by awarding custody to grandmother and unrestricted parenting time to mother. He argues that the APR was not in the child's best interests because it failed to mitigate concerns about mother and because he was better positioned to care for the child. We are not persuaded.

### A. Applicable Law and Standard of Review

¶ 11 The Colorado Children's Code authorizes a juvenile court to enter an order allocating parental responsibilities and addressing parenting time. § 19-1-104(5)-(6), C.R.S. 2025.

¶ 12 When allocating parental responsibilities in a dependency and neglect proceeding, a juvenile court must consider the legislative purposes of the Children's Code. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 12. The overriding purpose of the Children's Code is to protect a child's welfare and safety by providing procedures through which the child's best interests can be served. *People in Interest of J.G.*, 2021 COA 47, ¶ 19. Therefore, if a court allocates parental

responsibilities, it must do so in accordance with the child's best interests, focusing on the protection and safety of the child and not the parents' custodial interests. *People in Interest of H.K.W.*, 2017 COA 70, ¶ 13.

¶ 13 The juvenile court has broad discretion over the terms of an APR order. *See In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15. It abuses that discretion when it misapplies the law or when its ruling is manifestly arbitrary, unreasonable, or unfair. *People in Interest of E.B.*, 2022 CO 55, ¶ 14. It is for the juvenile court, as the trier of fact, to assess the credibility of witnesses and to determine the sufficiency, probative effect, and weight of the evidence. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010). When the record supports the juvenile court's findings, its resolution of conflicting evidence is binding on review. *B.R.D.*, ¶ 15.

B. Analysis

¶ 14 Before entering the APR to grandmother, the juvenile court made extensive findings in support of its decision. Specifically, the court found:

- Grandmother had been a "constant" in the child's life and had provided the consistency and stability that were in his best interests.

- The child had spent most of his life with grandmother.

- Grandmother loved the child and provided a stable home environment. She ensured that the child attended school and therapy and met all of his emotional, physical, and mental health needs.

- Grandmother was protective of the child. For example, when she believed mother had relapsed, she required mother to leave the home.

- Grandmother consistently put the child's needs first. For example, the weekend before the hearing, she changed her plans on short notice so the child could see father.

- Grandmother was "trying her best" to work with father and "clearly appreciate[d]" father being in the child's life.

- While it was in the child's best interests to have both parents in his life, neither of them had been a "constant" in his life.

- Mother was engaging in substance use treatment, demonstrating sobriety, and actively participating in the child's life. Although she was working on maintaining her stability and sobriety, she still had "a ways to go" and was not ready to be the child's primary caregiver.

- Father wanted the child in his life but did not always act in the child's best interests, particularly when father was angry or did not get his way.

- Father was not a consistent presence in the child's life. He was inconsistent with family time and attempted to "dictate visitation" by refusing to see the child if a visit could not occur at the exact time he suggested.

- Father had "moved very frequently" during the case and refused to provide his address to the Department even after the court ordered him to do so.

- Father had shown that he was "obstinate to authority figures . . . [and] rules." Because of that, he was unlikely to follow orders that required him to encourage and facilitate a relationship between the child and mother.

- Father's "refusal to cooperate with court orders [was] indicative of [him] putting [his] own interests in front of [the child's]."

¶ 15 The record supports the juvenile court's findings. The caseworker, who testified as an expert in child protection and welfare, opined that "continuity of care" was important for the child, particularly given his young age. She testified that the child had lived with grandmother and mother for the majority of his life but had never lived with father for any extended period. She further testified that grandmother was meeting all of the child's needs and providing a stable home environment. Consistent with that testimony, the life skills worker — who had been working with both grandmother and mother — testified that she had no concerns about their stability, as both were employed and had maintained the same home for nearly a year.

¶ 16 Both mother and grandmother testified that when mother relapsed, grandmother followed the caseworker's advice to remove mother from the home and ensure she had no contact with the child. Grandmother testified that she would "exercise the same protective capacity" if something similar occurred in the future,

because her priority was the child's safety and happiness. Mother likewise testified that grandmother "would do anything in her power to keep [the child] safe," even if that meant removing mother from the home.

¶ 17    Grandmother testified that she was "absolutely" willing to serve as "the party in between mother and father." The caseworker similarly testified that grandmother was "willing to work with both parents on setting up family time." An incident the weekend before the hearing illustrated that willingness. When father asked to see the child, grandmother wanted to accommodate him but could not drop the child off as early as he requested because she had already scheduled and paid for a family photographer that day. She offered to drop the child off later or to reschedule the visit for another day, but father refused and told her they would "deal with it in court."

¶ 18    Next, the caseworker testified that mother had been doing "really well with her treatment" in the eight months leading up to the hearing. Specifically, mother had been consistently attending group and individual therapy, working with the life skills coach, and testing negative for substances. The caseworker further testified that mother was employed and had "distanced herself"

from the boyfriend who initially caused concerns for the Department. Mother confirmed that she had been sober for eight months and had learned and grown considerably through treatment and parenting classes. Nevertheless, mother believed it was in the child's best interests for grandmother to serve as primary custodian — noting that grandmother was better able to co-parent with father and that the child felt safe with grandmother.

¶ 19 As for father, the caseworker testified that he "[had not] shown a lot of investment in time with [the child]." She further testified that his engagement had been "sporadic" and recounted how father went long periods without seeing or contacting the child throughout the case. She noted that father initially refused to attend family time because he did not believe he should be supervised.

¶ 20 The caseworker further testified that father seemed "very willing to just give up and not spend time with [the child]." She described one instance in which father informed her he would be in town and wanted to have the child for the entire weekend. When the caseworker proposed a seven-hour visit on Saturday and a four-hour visit on Sunday, father refused unless he could have the

child for the full weekend — and ultimately did not see the child at all.

¶ 21    The caseworker also testified that in the year leading up to the hearing, father had lived in Colorado, Texas, North Carolina, and South Dakota.  She opined that even if father's moves were for legitimate reasons, it would not be in the child's best interests to "bounce around to multiple states," particularly with respect to his education and school stability.  Relatedly, the caseworker testified, and father admitted, that he refused to provide the Department with any of his addresses throughout the case, even after the court specifically ordered him to do so.  This was concerning, she explained, because she was never able to conduct a safety assessment of father's home.

¶ 22    Finally, during cross-examination, father admitted that after the child was removed from his custody, he declared he was "done" with the case and that "this is a dumb court."  He further admitted that he thereafter refused to work with the Department, attend supervised family time, or participate in the case in any way.

¶ 23    We reject father's argument that the juvenile court abused its discretion by failing to mitigate the Department's safety concerns.

Father points to the safety concerns that the Department had at the outset of the case — mother's substance use, alleged sexual activity in front of the child, and housing instability. But the court was required to evaluate the child's best interests based on the circumstances existing at the time of the APR hearing, not those that prompted the filing of the petition. *See People in Interest of N.G.G.*, 2020 COA 6, ¶ 29 (a court's determination of a child's best interests must be based on the circumstances existing at the time of the proceeding). And, as noted above, the evidence amply supported the court's findings that, by the time of the hearing, (1) mother had been sober for eight months; (2) mother was no longer associating with her ex-boyfriend; (3) mother and grandmother had maintained stable housing for nearly a year; and (4) grandmother would protect the child's safety if mother relapsed again.

¶ 24 We also reject father's argument that the juvenile court should have granted him primary custody because he was more stable than grandmother and mother. In support, he points to evidence that he had a job, would be in South Dakota for the foreseeable future, and had a good relationship with the child. He also points

to evidence that mother had been charged with assault and harassment following an incident involving both parents approximately one month before the hearing. Essentially, father asks us to reweigh the evidence in his favor and substitute our judgment for that of the juvenile court. We may not do so. *See People in Interest of K.L.W.*, 2021 COA 56, ¶ 62 (it is not our role to reweigh the evidence or substitute our judgment for that of the juvenile court); *see also B.R.D.*, ¶ 15 (when there is record support for the trial court's findings, its resolution of conflicting evidence is binding on review); *In re Marriage of Udis*, 780 P.2d 499, 504 (Colo. 1989) (an appellate court may presume that the trial court considered all of the evidence admitted).

¶ 25 In sum, because the juvenile court's findings and conclusions were supported by the record, we cannot say that the court abused its discretion. We therefore affirm the court's determination that it was in the child's best interests to grant primary custody to grandmother and parenting time to both parents.

### III. Disposition

¶ 26 The judgment is affirmed.

JUDGE GROVE and JUDGE SCHOCK concur.